[No. 10939–1–I.  Division One.  October 24, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. KENNETH LEE MINES, *Appellant.*

*Thomas G. Burke,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Frederick Yeatts, Deputy,* for respondent.

CALLOW, J.—Kenneth Lee Mines appeals the judgment entered after a jury verdict, which adjudged him guilty of second degree murder while armed with a deadly weapon. We are asked to decide the following issues:

1. Whether the refusal of the trial court to appoint an expert witness to assist the defense violated the defendant's right to due process of the law.

2. Whether a defendant has the right to review the medical records of a prosecution witness when the trial court has examined the records, in camera, and found them exempt from discovery based on the physician–patient privilege.

3. Whether the State's failure to protect and preserve evidence found at the scene of the crime was violative of the defendant's right to due process of the law.

On January 2, 1981, witness Kathleen Dixson met her former boyfriend, victim Timothy Kelly, for the first time since their breakup 2 years previously. They went out to dinner and returned to Dixson's residence around 5 p.m.

where they engaged in sexual relations. There was testimony that while at Dixson's residence they had consumed some alcohol and that Dixson had smoked some marijuana.

At approximately 7:30 p.m., Kenneth Lee Mines, the defendant, was driven to Dixson's house by a Dwight Schinkal. Mines and Dixson had known each other since September of 1980. Schinkal remained in the car while Mines went up to the house, knocked on the front door, and went around to the back of the house when he received no response. Meanwhile, Kelly was gathering his clothes and getting dressed. When Mines saw that Dixson was in the house he jumped through the bathroom window, knocking plants off a stand, and pushed Dixson into the shower. He became enraged when he saw Kelly and ran into the kitchen and grabbed a butcher knife that he recently had given to Dixson. He hit Dixson with a chair when she followed him into the kitchen and slapped her. Mines then attacked Kelly and stabbed him with the butcher knife cutting his own hand in the process. He immediately left the premises and had Schinkal take him to Harborview Hospital to receive treatment for his hand. Kelly died within minutes and Mines was arrested while still at Harborview Hospital.

On March 9, 1981, Mines was found guilty by jury verdict of murder in the second degree while armed with a deadly weapon. Following a supplemental nonjury trial he was further adjudged to be a habitual criminal. On October 29, 1981, he was sentenced to a term of life imprisonment.

The first issue presented is whether the refusal of the trial court to appoint an expert witness to assist the defense violated the defendant's right to due process.

In a pretrial proceeding, defense counsel moved in limine to exclude Dixson's testimony on the grounds that she was incompetent due to her mental condition. This was based on defense allegations that Dixson had voluntarily committed herself for psychiatric treatment immediately following the incident and was under medication as a result of the treatment. The trial court denied this motion but granted a

competency hearing prior to trial. Defense counsel then requested the court to appoint an expert witness who could examine Dixson prior to the competency hearing to assist the defense at the hearing. Finding an insufficient showing the trial court denied the request for the appointment of an expert, but permitted defense counsel to raise it again, upon a proper showing, following the competency hearing. Dixson was subsequently found competent and permitted to testify at trial.

■ Mines contends that the trial court's denial of his request for an expert witness prior to the competency hearing deprived him of his constitutional right to effective assistance of counsel. However, a defendant's constitutional right to the assistance of an expert witness "is no broader than his right to petition for state paid services under CrR 3.1(f)." *State v. Dickamore,* 22 Wn. App. 851, 854, 592 P.2d 681 (1979). CrR 3.1(f) states in part:

> Counsel for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in his case may request them by a motion. Upon finding that the services are necessary and that the defendant is financially unable to obtain them, the court shall authorize counsel to obtain the services on behalf of the defendant.

This rule requires the State "to pay for expert witnesses for an indigent defendant only where such services are necessary to an adequate defense." *State v. Niemczyk,* 31 Wn. App. 803, 805, 644 P.2d 759 (1982).

The determination of whether such services are necessary for an adequate defense is in the sound discretion of the trial court and will not be overturned on appeal unless the appellant clearly establishes substantial prejudice. *State v. Stamm,* 16 Wn. App. 603, 605, 559 P.2d 1 (1976).[1]

---

[1]*See also Williams v. Martin,* 618 F.2d 1021 (4th Cir. 1980); *United States v. Moss,* 544 F.2d 954 (8th Cir. 1976); *Mason v. Arizona,* 504 F.2d 1345 (9th Cir. 1974), cert. denied, 420 U.S. 936 (1975); *State v. Peeler,* 126 Ariz. 254, 614 P.2d 335 (Ct. App. 1980); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977); *Stevens v. State,* 247 Ga. 698, 278 S.E.2d 398 (1981); *Graham v. State,* ___ Ind. ___, 441 N.E.2d 1348 (1982); *State v. Reynolds,* 230 Kan. 532, 639 P.2d 461 (1982); *State*

We hold that the trial court acted within its discretion in denying a state appointed expert for the defense prior to the competency hearing. A discretionary decision of a trial court "will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971). The evidence did not show that the "services were necessary for an adequate defense" or that Dixson's alleged mental condition caused her to be of unsound mind. RCW 5.60.050(1);[2] CrR 6.12(c);[3] *see State v. Froehlich,* 96 Wn.2d 301, 304, 635 P.2d 127 (1981). Nor was it shown that she was unable to understand the nature of the oath or of giving a correct account of what she had seen or heard. *State v. Moorison,* 43 Wn.2d 23, 259 P.2d 1105 (1953); *see State v. Froehlich, supra* at 307; 5 K. Tegland, Wash. Prac. § 162 (2d ed. 1982). Furthermore, Mines has not assigned error to the determination that Dixson was competent to testify. Hence, even if the trial court did abuse its discretion in not appointing an expert witness as requested, Mines was not prejudiced.

Mines also contends that the denial of a state appointed expert violated due process because he needed such expert to prepare his cross examination of Dixson at trial. Mines did not raise this issue before the trial court although the court expressly granted him permission to do so following

---

*v. Burnett,* 222 Kan. 162, 563 P.2d 451 (1977); *State v. Pickering,* 245 N.W.2d 634 (S.D. 1976).

[2]RCW 5.60.050(1) states:
"The following persons shall not be competent to testify:
"(1) Those who are of unsound mind, or intoxicated at the time of their production for examination . . ."

[3]CrR 6.12(c) states in part:
"The following persons are incompetent to testify: (1) Those who are of unsound mind, or intoxicated at the time of their production for examination . . ."

the competency hearing. He did not make the requisite showing of need under CrR 3.1(f) and cannot now claim error.

The second issue presented is whether a defendant has the right to review the medical records of a prosecution witness when the trial court has examined the records in camera and found them exempt from discovery based on the physician–patient privilege.

In response to concern over permitting the defendant to inspect witness Dixson's medical records without her consent the trial court reviewed, in camera, the medical records relating to Dixson's psychiatric treatment after the stabbing incident. The trial court found that there was nothing in these records to justify disclosure and denied the defendant's motion to release these records. The trial court further found that there was nothing in the records inconsistent with the sworn testimony and that the cross examination would not have been aided by these records. The defendant contends that this was error since counsel should have been allowed to read the medical records of Dixson in order to prepare his cross examination of her.

■ The physician–patient privilege is codified in RCW 5.60.060(4) which states, in part:

> A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe or act for the patient . . .

Although RCW 5.60.060(4) is a civil statute, it "has been held to apply to criminal cases by virtue of RCW 10.58.010,[4] giving the patient the right to elect to claim the privilege." *State v. Gibson,* 3 Wn. App. 596, 598, 476 P.2d 727 (1970); *see State v. Broussard,* 12 Wn. App. 355, 529 P.2d 1128 (1974); *State v. Tradewell,* 9 Wn. App. 821, 515 P.2d 172 (1973). Communications from a patient to a

---

[4]RCW 10.58.010 states:

"The rules of evidence in civil actions, so far as practicable, shall be applied to criminal prosecutions."

physician are privileged if necessary to obtain professional advice or treatment and "[t]he fact that the statements were necessary to receive treatment may be inferred from the circumstances without formal proof." *State v. Gibson, supra* at 598. Hospital records are also privileged if they contain information supplied by the patient. *Randa v. Bear,* 50 Wn.2d 415, 421, 312 P.2d 640 (1957); *Toole v. Franklin Inv. Co.,* 158 Wash. 696, 698, 291 P. 1101 (1930).

> The purpose of the statutory privilege is to surround patient–physician communications with "the cloak of confidentiality" to promote proper treatment by facilitating full disclosure of information. A secondary purpose is to protect the patient from embarrassment or scandal which may result from revelation of intimate details of *medical treatment.*

(Italics ours.) *Department of Social & Health Servs. v. Latta,* 92 Wn.2d 812, 819, 601 P.2d 520 (1979); *see State v. Boehme,* 71 Wn.2d 621, 635, 430 P.2d 527 (1967), *cert. denied,* 390 U.S. 1013, 20 L. Ed. 2d 164, 88 S. Ct. 1259 (1968). We recognize that some privileged records although inadmissible at trial may still be subject to pretrial discovery. *Cook v. King Cy.,* 9 Wn. App. 50, 52, 510 P.2d 659 (1973); *Mebust v. Mayco Mfg. Co.,* 8 Wn. App. 359, 506 P.2d 326 (1973). However, the scope of discovery is within the discretion of the trial court, subject to review only for manifest abuse. *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970), *vacated,* 408 U.S. 937 (1972); *Seattle v. Apodaca,* 18 Wn. App. 802, 803, 572 P.2d 732 (1977).

Since the medical records could have contained privileged information the trial court did not require disclosure, but, with the witness Dixson's consent, inspected the medical records in camera. This procedure is authorized by the court rules governing discovery.

> *In Camera Proceedings.* Upon request of any person, the court may permit any showing of cause for denial or regulation of disclosure, or portion of such showing, to be made in camera. A record shall be made of such proceedings. If the court enters an order granting relief following a showing in camera, the entire record of such showing

shall be sealed and preserved in the records of the court, to be made available to the appellate court in the event of an appeal.

CrR 4.7(h)(6). In camera consideration is the preferred procedure used to prevent the unnecessary disclosure of the identity of informants. *State v. Harris*, 91 Wn.2d 145, 150, 588 P.2d 720 (1978); *State v. Ellis*, 34 Wn. App. 298, 660 P.2d 774 (1983); *State v. Allen*, 27 Wn. App. 41, 615 P.2d 526 (1980); *State v. Potter*, 25 Wn. App. 624, 611 P.2d 1282 (1980).

Similarly, an in camera review of the medical records of Dixson allowed the trial court to determine whether or not the records or a portion thereof were indeed privileged. This sequestered observation protected the privacy between physician and patient and adhered to the legislative policy establishing the privilege. There is no right to discover evidence that is privileged and a defendant may not utilize the discovery procedure to obtain privileged information. Defense counsel have an obligation to ferret out all relevant evidence, material and favorable to a defendant, but may not perform this duty by breaching the physician–patient privilege.

Our review of the sealed medical records indicates that the information contained therein was indeed protected by the physician–patient privilege. We further agree that nothing in the records would have assisted defense counsel in impeaching the sworn testimony of Dixson. We hold that the motion for release of Dixson's medical records was properly denied.

■ Mines' further contention that even if the medical records were privileged he should have been permitted to review such records to determine whether they contained the prescription records of Dixson is not warranted under the circumstances of this case. He argues that prescription records are not covered by the physician–patient privilege under *State v. Mark*, 23 Wn. App. 392, 597 P.2d 406 (1979). *Mark* involved an audit of a pharmacy pursuant to RCW 18.64.245 which mandates the production of a pharmacy or

drugstore's prescription records in court or before any grand jury when required by court order. The court found that RCW 18.64.245 effectively superseded the physician–patient privilege codified in RCW 5.60.060(4). Moreover, the court found that the contemplated audit would not be publicly disclosed in open court resulting in a breach of confidentiality. The court further found that the public interest served by the audit and the underlying prosecution of those involved in Medicaid fraud overrides the individual assertion of the privilege. None of these circumstances are present here. There was no court order or a specific statute authorizing the production of Dixson's prescription records. Disclosure would have revealed the entire contents of the records in open court. Further, there was no countervailing public interest outweighing Dixson's right to assert the privilege. We also note that the prescription records contained in the medical records would not have cast doubt on Dixson's ability to relate the circumstances of the crime, nor aided defense counsel in cross examination. It was proper to refuse to release the medical records of Dixson.

The third issue presented is whether the State's failure to protect and preserve evidence found at the scene of the crime was violative of the defendant's right to due process of the law.

Subsequent to the official police investigation but before the defense investigator could examine the crime scene, Dixson's residence was cleaned and her furniture and personal belongings were removed. This was done with the consent of the police officer who conducted the initial investigation. Mines contends that this amounted to the intentional destruction of evidence before its existence could be disclosed to the defense violating his right to due process, thereby requiring dismissal of all charges. Specifically, he argues that the following items of evidence should have been preserved since they had a reasonable possibility of being favorable to the defense:

1. A marijuana pipe at the scene of the incident should

have been preserved since chemical analysis could have indicated what substance was smoked in the pipe. This could have enabled defense counsel to rebut and impeach Dixson's testimony that only marijuana was consumed in the pipe and would have cast doubt on Dixson's ability to observe or recall.

2. A more thorough investigation of the house may have disclosed the missing tip of the butcher knife used in the homicide. The location of the knife tip, as well as whether it was embedded in any surface would have indicated the existence of a struggle and established the reasonableness of the possibility of self-defense.

3. The State should have collected additional blood samples throughout the apartment and waited until defense counsel inspected the premises before allowing the house to be cleaned. Such samples and analysis could have determined the pattern of movement of Mines and the victim which may have indicated a struggle demonstrating self-defense.

4. Witness Dixson should have been thoroughly searched and her clothing collected. An inspection of her garments would have revealed the truth or falsity of her statements by indicating blood spots, hairs, or other body fluids.

In order to claim a violation of due process based on destruction of evidence, there must be a reasonable possibility that the evidence destroyed was material to guilt or innocence and favorable to the defendant. *State v. Wright,* 87 Wn.2d 783, 792, 557 P.2d 1 (1976). Good faith or bad faith on the part of the prosecution is irrelevant. *State v. Wright, supra* at 792. The duty to preserve evidence "includes the police as well as private citizens acting under their authority." *State v. Vaster,* 99 Wn.2d 44, 53, 659 P.2d 528 (1983). As stated in *State v. Vaster, supra* at 52:

> We therefore find it necessary to adopt a reasonable balance for those cases in which there has been an inadvertent or good faith loss or destruction of evidence.
> In weighing the burdens necessarily imposed on both the defendant and the prosecution, a court should first

consider whether there exists a *reasonable possibility* that the missing evidence would have affected the defendant's ability to present a defense. The burden of establishing that "reasonable possibility" rests with the defendant. "Reasonableness" must be determined in light of the peculiar circumstance of each case. Lost or destroyed evidence which does not rise to the level of establishing a "reasonable possibility" that it will exculpate a defendant will be deemed insufficiently material to constitute a due process violation.

Next, the court must balance the consideration of "reasonableness" against the ability of the prosecution to have preserved the evidence. Further, in determining the appropriate sanction, a court should consider procedures established for preserving evidence, the nature of the lost evidence, and the circumstances surrounding its loss. *See* Note, *Criminal Procedure—Preservation of Due Process When Evidence Is Destroyed or Tested—State v. Wright,* 53 Wash. L. Rev. 573 (1978).

There is no contention that the police officer acted in bad faith in authorizing the house to be cleaned. We do not find a reasonable possibility that any of the allegedly missing evidence would have exculpated the defendant. Mines' contention that the missing knife tip and the pattern of blood spatters could have substantiated his theory of self-defense is speculation that such evidence would have been favorable. "Imaginative speculation may lead to a conclusion that destroyed evidence could be material and favorable, but such a possibility may not be *reasonable.*" *State v. Bernhardt,* 20 Wn. App. 244, 247, 579 P.2d 1344 (1978). The police investigator took extensive photographs of both the exterior and interior of the house. *See United States v. Shafer,* 445 F.2d 579 (7th Cir.), *cert. denied,* 404 U.S. 986 (1971). A citizen witness who arrived immediately following the stabbing testified in detail as to the location of the body, blood spots, and the interior of the house. We need not see the photographs to determine that such evidence was sufficient to enable Mines to argue his theory of self-defense. Hence, the missing knife tip and additional blood samples would have been cumulative at best.

In addition, evidence of the substance smoked in the marijuana pipe and of Dixson's clothing would have served only to impeach Dixson's testimony. Mines was able to cross–examine Dixson concerning the circumstances of the stabbing and had ample opportunity to impeach her credibility. He was also able to argue to the jury that Dixson's recollection may have been impaired by the influence of alcohol and marijuana. We hold that the absence of the alleged evidence did not constitute a violation of due process. *See State v. Vaster, supra* at 52.

Following the filing of briefs the appellant moved to amend his brief and include for the consideration of the court the propriety of the instructions given on self–defense. We are cited to *State v. McCullum*, 98 Wn.2d 484, 656 P.2d 1064 (1983). We have reviewed the instructions given the jury and find that the jury was instructed as follows in regard to self–defense:

A person commits the crime of murder in the second degree when with intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person unless the killing is justifiable.

. . .

A person commits the crime of murder in the second degree when he or she commits or attempts to commit assault in the second degree and in the course of and in furtherance of such crime or in immediate flight from such crime he or she or another participant causes the death of a person other than one of the participants unless the killing is justifiable.

. . .

It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the lawful defense of the slayer when the slayer has reasonable ground to believe that the person slain intends to inflict death or great bodily harm and there is imminent danger of such harm being accomplished.

The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the slayer at the

time.
. . .
No person may by any unlawful act create a necessity for acting in self–defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self–defense is not available as a defense.

■ We hold that the instructions given were sufficient in that they informed the jury concerning the burden on the prosecution of proving each element of the crime beyond a reasonable doubt and permitted the defendant to argue his theory of defense. Further, no instruction was given which misled the jury, as in *McCullum*. Likewise, as indicated by *McCullum,* its tenet requiring the jury to be instructed in every case where self–defense is raised that the State has the burden of proving the absence of self–defense beyond a reasonable doubt, is to be applied prospectively only.

The remaining assignments of error were waived at the time of oral argument.

The judgment is affirmed.

DURHAM, A.C.J., concurs.

RINGOLD, J. (dissenting)—I disagree with the majority for the reasons expressed in my dissenting opinion in *State v. Takacs,* 35 Wn. App. 914, 671 P.2d 263 (1983).

Reconsideration denied January 12, 1984.

Review denied by Supreme Court April 6, 1984.